T.C. Memo. 2021-76

UNITED STATES TAX COURT

MICHAEL R. KELLY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6225-16, 16847-16.　　　　　Filed June 28, 2021.

<u>Kevan P. McLaughlin</u> and <u>Phillip L. Jelsma</u>, for petitioner.

<u>Monica D. Polo</u>, <u>Donna L. Crosby</u>, <u>Vladislav M. Rozenzhak</u>, <u>Monica Cendejas</u>, and <u>Clinton M. Crosser</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  In these consolidated cases, respondent issued two notices of deficiency determining the following deficiencies and penalties:

[*2]

| Year | Deficiency | Penalty sec. 6663 |
|------|-----------|-------------------|
| 2007 | $6,723,181 | $4,505,289 |
| 2008 | 3,359,322 | 2,460,017 |
| 2009 | 1,481,917 | 1,051,239 |
| 2010 | 27,953,488 | 20,897,162 |
| 2011 | 158,661 | 118,996 |

In the alternative to the fraud penalties, respondent determined 20% accuracy-related penalties under section 6662(a)[1] for each of the years at issue.

Various smaller issues included in the above deficiency determinations have been settled, and Mr. Kelly chose not to challenge several other smaller issues on brief. The principal issues remaining in dispute involve Mr. Kelly's transfers of funds between corporations he owned and the tax treatment of those transactions. The transactions are factually complex. For the first three years there are statute of limitations issues and determinations of fraud. Respondent has conceded the penalties for tax years 2010 and 2011 because he did not establish that written supervisory approval was obtained as required by section 6751(b).

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, title 26, U.S.C., in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

**[*3]** The issues remaining for decision are more specifically stated as follows.

(1) Were transfers from National Service Industries, Inc. (NSI), to Kelly Capital, LLC (Kelly Capital), bona fide loans, or should the amount by which the transfers exceeded Mr. Kelly's adjusted basis in NSI be treated as taxable capital gain for the respective tax years? This issue further relates to the broader question of whether the funds transferred to Mr. Kelly and his companies were bona fide loans or should be treated as distributions. We hold that transfers after 2007 were not loans but rather distributions valued at the face amounts of the funds transferred.

(2) To the extent that the funds transferred to Mr. Kelly and his companies were bona fide loans, did Mr. Kelly receive taxable distributions when the loans were canceled, and if so, what was the value of the distributed property? We hold that Mr. Kelly received taxable distributions to the extent we have found that the loans were bona fide and the distribution amounts are the face values of the loans.

(3) For tax year 2010, to the extent that loans existed, did Mr. Kelly have taxable cancellation of debt (COD) income, or was he insolvent such that the discharge of indebtedness is not includable in his gross income under section 108(a)(1)(B)? We hold that Mr. Kelly's insolvency computation for 2010 requires the elimination of loans to him from his closely held companies. Accordingly, we

[*4] hold that his COD income is overstated, and the parties must compute the insolvency amount in the Rule 155 computations in accordance with our holdings herein.

(4) Inextricably linked to the first three issues is the question of whether Mr. Kelly is entitled to a nonbusiness bad debt deduction for tax year 2010. We hold Mr. Kelly has not established that he is entitled to a nonbusiness bad debt deduction.

(5) For tax years 2010 and 2011, did Kelly Capital have additional taxable income on the basis of deposits in its bank accounts, or were the deposits from bona fide loans or other nontaxable sources? We hold there was no additional income.

(6) For tax year 2009, is Mr. Kelly entitled to a loss deduction for forgiven loans made primarily to his brother and the Bitter End, Inc. (TBE)? We hold Mr. Kelly has failed to establish such a deduction should be permitted.

(7) For tax year 2010, is Virtucon, LLC (Virtucon), allowed to deduct $1,482,334 in interest related to its ownership of an airplane? We hold the deduction is not proper.

[*5]   (8) For tax years 2010 and 2011, is Kelly Yacht & Charter, Ltd. (KY&C), entitled to deduct various expenses including those paid with borrowed funds? We hold the deductions are proper.

(9) For tax year 2010, are the following deductions allowed for Lemon Bay Horizons, LLC (LBHorizons), the developer of several Florida condominiums?

| Expense | Amount |
| --- | --- |
| Interest/other | $156,405 |
| Taxes and licenses | 53,314 |
| Other | 19,943 |

We hold this treatment is proper.

(10) For tax years 2010 and 2011, is Mr. Kelly entitled to passive activity loss deductions from Front Street Investment Fund, LLC (FSIF), to net against passive activity income?  Similarly, for tax year 2010, is Mr. Kelly entitled to deduct suspended and unused passive activity losses from Radius Mortgage Capital, LLC (Radius Mortgage)?  The deductions are allowed to the extent allowable in the Rule 155 computations.

(11) Has respondent proven, for tax years 2007, 2008, and 2009, by clear and convincing evidence, that Mr. Kelly underpaid his tax and that some part of the underpayment for each year was due to fraud?  In the alternative to the section

**[*6]** 6663 fraud penalty for tax year 2009, is Mr. Kelly liable for an accuracy-related penalty under section 6662(a)? We hold the fraud penalty is not sustained for 2007, 2008, or 2009 and further hold that if there is a 25% omission from gross income for 2009, the section 6662(a) penalty applies for that year.

(12) For tax years 2007, 2008, and 2009, did respondent timely issue the notice of deficiency under section 6501(a)? We hold that the deficiency notice is untimely for 2007 and 2008 and the status for 2009 depends on whether a 25% omission of gross income under section 6501(e)(1) is sustained in the Rule 155 computations.

(13) Was Mr. Kelly's failure to timely file Forms 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations, for tax years 2008 and 2009 the result of reasonable cause and not willful neglect? We hold there was reasonable cause.

All other unsettled issues are computational.[2]

---

[2]To the extent that the unaddressed issues are unresolved and are not computational, Mr. Kelly has conceded them on the basis of his failure to address them on brief, including losses reported on Schedules E, Supplemental Income and Loss, attached to his personal returns for 2010 and 2011.

**[*7]**                          FINDINGS OF FACT

The parties have stipulated facts which are incorporated herein by this reference.  When the petitions were timely filed, Mr. Kelly resided in California.

Mr. Kelly's first experience in buying and selling companies came when he bought a sporting goods store for $25,000 in the 1980s that he successfully resold for a $50,000 profit.  In the early 1990s Mr. Kelly's father purchased a $150 million portfolio of loans from a bankruptcy receiver for $75 million and asked Mr. Kelly to join him in reselling the loans.  Mr. Kelly moved from California to Arizona and began to learn the process of flipping loans under the tutelage of his father and Robert Jacobson, a lawyer assisting in the transactions.

Mr. Kelly visited various banks, met with their presidents or managers, and tried to resell the loans for more than the discounted purchase prices.  Mr. Kelly developed a personal and professional relationship with the owners of one such bank, Mountain Community Bank, which would become one of Mr. Kelly's future lenders.  Mr. Kelly was paid 5% of net proceeds from the sale of the loans for his efforts.  Mr. Kelly's understanding of flipping loans progressed, and he was soon able to capitalize on other loan portfolios.  He began bidding on smaller loan portfolios.  While working for his father, Mr. Kelly began collecting from some

[*8] debtors, working out loans with borrowers, or taking ownership of the underlying property in foreclosure.

I.      Early Business Operations

Sometime around 1993 Mr. Kelly and his father's business relationship deteriorated. Mr. Kelly returned to California and began a similar loan trading business with his brother, Richard. In August 1993 the brothers set up First Commercial Corp. (FCC), an S corporation, with each brother owning an equal share. Over time, Mr. Kelly's ownership of FCC increased. By 2009 Mr. Kelly owned 66.1% and Richard owned 33.9%, and in 2010 and 2011 Mr. Kelly owned 75% and Richard owned 25%.

One of the brothers' first businesses was a San Diego bar. In or around 1995 Mr. Kelly identified a local bar, the Orient, as a possible business venture. On January 10, 1995, the brothers organized a special purpose entity, TBE, to purchase and hold the liquor license and to operate the bar. Mr. Kelly borrowed $250,000 from FCC to purchase the liquor license. TBE borrowed $2 million from Mountain Community Bank to renovate the bar's three-story building. FCC and Mr. Kelly personally guaranteed the loan. The loan was eventually repaid. In 2007 and 2008, Mr. Kelly owned 51% of TBE and Richard owned 49%. During

[*9] 2009 Richard's ownership increased to 77.6%, Mr. Kelly owned 18.2%, and three other individuals owned the remainder.

Another joint venture of the brothers was Lucky Bastard Records, LLC (Lucky Bastard Records), a company established to produce and promote a band. Mr. Kelly and Richard each owned 50% of Lucky Bastard Records. FCC advanced money to Lucky Bastard Records, which FCC recorded as a debt, and as of December 31, 2007, Lucky Bastard Records owed $952,393 to FCC. For tax year 2007, Mr. Kelly reported over $75,000 of nonpassive income attributable to Lucky Bastard Records.

### A. Nonperforming Loans

In the late 1990s Mr. Kelly began focusing his investment activity on assets used as security for nonperforming loans and the value of the assets relative to the loans' values. The underlying assets became more important. Mr. Kelly engaged in some of these ventures through FCC and in others on his own. The assets typically included a business entity with associated real estate. Mr. Kelly would foreclose on the collateral, make improvements to the business and property, and then either operate the business or resell it. Mr. Kelly initially borrowed money from third-party lenders to finance the purchase of the nonperforming loans. Mr. Kelly obtained loans from his old friends at Mountain Community Bank. He also

[*10] obtained loans from Fremont Investment & Loan, Fortress,[3] and First American Bank.  He developed a history of repaying these lenders and reinvesting the remaining sale proceeds in his next business venture.  He approached each deal with the plan to use the proceeds to finance the next, hopefully bigger, deal, with many successful sales of his business investments.

In a typical transaction, Mr. Kelly would, in part at the request of the lenders, set up two special purpose entities:  one to own the foreclosed real estate and one to manage any business operations connected with the real estate.  One of the goals was to isolate the risks from the business operations from the real estate, which the lenders generally valued more.  Ultimately, FCC traded over $3.3 billion in loans and real estate between 1993 and 2003 and acquired numerous real estate projects throughout California including residential developments in Orange Grove, residential lots in Moreno Valley, lots in Rainbow, vacant office buildings, and strip-mall shopping areas.

In 2004 Mr. Kelly decided to start his own company without his brother, to operate the same way that FCC had operated.  On September 29, 2004, Mr. Kelly organized Kelly Capital as a single-member limited liability company (LLC).  Mr.

---

[3]The record refers to loans from and/or assigned by or to Fortress Credit Corp., Fortress Investment, and Fortress Financial.  For convenience, we refer to these three entities collectively as Fortress.

[*11] Kelly was the sole member from its organization through the years at issue. He shifted FCC's activities and employees to Kelly Capital. However, FCC continued in existence. FCC's records for 2007 reflected $3,883,567 and $4,462,446 due from these entities, respectively, which FCC wrote off as bad debts for the 2007 tax year.

Ultimately, Mr. Kelly set up over 25 closely held companies, many as single-member LLCs, that he owned and controlled (affiliated companies). He began to transfer money between his affiliated companies to fund his business ventures and recorded the transfers as loans. He did not cause his single-member LLCs to file entity-level returns. Instead, he reported the tax items of each single-member LLC on a Schedule C, Profit or Loss From Business, attached to his personal return. For 2007 Kelly Capital reported a profit of approximately $2.7 million with receipts of $13 million. However, for 2008, 2009, and 2010 it reported losses of $1.5 million, $8 million, and $1.1 million, respectively, with gross receipts of $2 million, $500,000 and $4 million, respectively.

B.    Accounting Activities

FCC used the nomenclature "due to" and "due from" to track how much money was owed between Mr. Kelly's affiliated companies. Initially, FCC used the outside accounting services of Robert Regnery at Kenneth Leventhal & Co.,

[*12] who later became FCC's chief financial officer (CFO). Mr. Regnery likely introduced the "due to" and "due from" method to track the transfers between Mr. Kelly's affiliated companies. Mr. Kelly's affiliated companies consistently adhered to this method to track transfers during the years at issue. In 1994 FCC hired Joseph Thomas as a staff accountant. He was transferred to Kelly Capital, where he worked during the years at issue. In his early role, he was the person on the accounting staff to record these transactions. Later, he served as vice president and senior vice president controller, and his responsibilities consisted of overseeing the company's cashflow, financials, bank reconciliations, and investments to ensure the information that was provided to Mr. Kelly for financial reports was accurate. Mr. Thomas typically prepared Mr. Kelly's personal financial statements.

Over the decades of their operations, Mr. Kelly's companies developed accounting departments that employed qualified professionals. They also employed in-house legal counsel. In 1999 Charles Blottin replaced Mr. Regnery as FCC's CFO, and he eventually moved to Kelly Capital. In August 2005 Mr. Bowen replaced Mr. Blottin and served until his departure around December 2018. Mr. Bowen has been a certified public accountant (C.P.A.) since 1984 and has an extensive career as an accountant. Mr. Thomas reported to the CFOs including

[*13] Mr. Bowen. Michael Marks, an attorney, worked for FCC and later Kelly Capital from 2002 to 2012, serving as general counsel during most of that time except for when Louis Alonso served as general counsel during 2007 through 2009.

II.     Mr. Kelly's Business Ventures

In 1997 Mr. Kelly purchased a $28 million nonperforming loan secured by a hotel in Kauai, Hawaii, for $2.8 million. He foreclosed on the loan. Pacific Rim Partners was organized to own the hotel, and Pacific Coast Partners, LLC (Pacific Coast), was organized to manage the hotel; it changed the name to Kelly Hospitality, LLC (Kelly Hospitality), in 2007. From the date of registration, October 31, 1997, through December 31, 2011, Mr. Kelly was the sole member of Pacific Coast and Kelly Hospitality. For convenience we refer to these two entities collectively as Kelly Hospitality.

In 1998 Mr. Kelly acquired a nonperforming loan secured by 1,868 acres of real estate in Julian, California. Mr. Kelly borrowed roughly $3 million to acquire the loan and then foreclosed on the property. On February 10, 1998, Julian Country Estates, LLC (JCE), was organized to own the real estate, with Mr. Kelly and Richard each owning 50%. Around 2002 JCE sold the real estate for roughly

[*14] $9.2 million, and Mr. Kelly reinvested the proceeds in a hotel adjacent to TBE's bar known as the Ivy Hotel, discussed further below.

Another business venture of Mr. Kelly was Fat City, a 140,000-square-foot family entertainment center in Littleton, Colorado, which FCC acquired by purchasing a $25 million nonperforming loan for roughly $2 million. On January 1, 1999, Greenback Holdings, LLC (Greenback Holdings), was organized as a special purpose entity to hold the entertainment center. Cutthroat Entertainment, Inc., which later changed its name to Greenback Entertainment, Inc. (Greenback Entertainment), an S corporation, was organized to manage and operate the business, separating the ownership of the real estate and the management of business operations in two entities in accordance with Mr. Kelly's typical practice. Mr. Kelly and his entities borrowed roughly $10 million and invested it in Fat City and operated the business for seven years. Around 2008 Mr. Kelly sold Fat City, used the proceeds to repay existing liabilities, and reinvested the remaining funds in his other businesses. Greenback Entertainment continued in existence, and during 2009 through 2011 it was wholly owned by Mr. Kelly. Greenback Entertainment recorded intercompany transfers to and from Mr. Kelly's affiliated companies including a $1.7 million transfer to Kelly Capital. As of the end of

[*15] 2010, Greenback Entertainment had amounts due to Kelly Capital of approximately $2 million according to Kelly Capital's records.

In another transaction, Mr. Kelly purchased a nonperforming loan secured by a golf course near Modesto, California, and foreclosed on the property. Hidden Hills Holdings was organized as the special purpose entity to own the golf course, and Hidden Hills Resort was organized to operate the golf course. Initially, Mr. Kelly and Richard each owned 50% of Hidden Hills Holding, and Mr. Kelly owned 100% of Hidden Hills Resort. Mr. Kelly renovated the property, installing cart paths and fixing up the club house to increase golfer traffic. Mr. Kelly eventually sold the golf course, apparently at a loss. FCC transferred money to Hidden Hills Holdings and Hidden Hills Resort.

In June 2003 Mr. Kelly acquired his first publicly traded company, NSI, a Delaware corporation (NSI-DE), for $113 million (NSI acquisition), with the intention of liquidating its assets and investing the proceeds in other business ventures. Mr. Kelly borrowed the purchase price from institutional lenders and a private investor. He personally guaranteed these loans. He gave a 5% ownership interest in NSI-DE to David Nicolas Spriggs II to compensate Mr. Spriggs for his work in identifying NSI-DE as a possible target and his assistance with the acquisition process. Mr. Spriggs had been working with Mr. Kelly and Richard

[*16] since 1999. Around the time of the NSI acquisition, Mr. Kelly organized Kelly Capital as a single-member LLC, and on January 26, 2007, he transferred his 95% interest in NSI-DE to Kelly Capital.

At some point, Mr. Kelly caused NSI-DE to organize a California corporation by the same name as a wholly owned subsidiary (NSI-CA). NSI-DE and NSI-CA filed consolidated S corporation returns for the years at issue. In May 2012 NSI-CA changed its name to Englewood Holdings Corp. (Englewood). We refer to the Delaware parent company as NSI-DE, the California subsidiary as NSI-CA, and the two entities collectively as NSI.

Before 2001 NSI was a diversified conglomerate engaged in various businesses. In 2001 NSI decided to spin off various businesses into a separate publicly traded company. When Mr. Kelly acquired NSI-DE, its business operations were unprofitable but it had approximately $20 to $30 million cash on hand. It primarily engaged in two business areas, textile rentals and envelope manufacturing. NSI-DE's textile rental activity provided napkins, table and bed linens, bath towels, pillowcases, bar towels, scrubs and surgical cloths, mats, mops, and restroom supplies to dining, lodging, and healthcare customers through National Linen & Uniform Service, LLC (National Linen). The envelope manufacturing activity made custom envelopes for clients in the energy, finance,

[*17] transportation, direct mail, and package delivery markets through Atlantic Envelope Co., LLC (Atlantic Envelope). National Linen and Atlantic Envelope operated roughly 77 plants, almost exclusively east of the Mississippi River, and had roughly 6,500 to 7,500 employees.

At one time NSI-DE owned North Brothers, Inc. (North Brothers), a regional distributor of asbestos-containing insulation primarily in the southeastern United States and became subject to claims of liabilities related to the asbestos products sold or installed by North Brothers. Between 1972 and 2002 NSI-DE received over 187,000 asbestos claims including 57,775 claims filed in 2001 and 2002. As of December 31, 2002, 25,466 claims were still pending. Claims continued to be filed after the NSI acquisition and as of August 31, 2005, there were 41,700 open or pending asbestos claims. As of July 12, 2012, the number of pending asbestos claims had shrunk to approximately 28,258.

In 1985 NSI entered into an agreement with 31 other producers of asbestos or asbestos-containing products and 16 insurers, known as the Wellington Agreement. Under its terms the Asbestos Claims Facility (ACF) was created as a nonprofit claims handling center that coordinated claim payments on behalf of dozens of asbestos defendants. The parties to the Wellington Agreement, like NSI-DE, sought to reduce asbestos litigation awards while lowering the associated

[*18] costs by agreeing to an allocation formula for all claims whereby each party agreed to pay a share of every settled or adjudicated asbestos claim asserted against one or more Wellington Agreement parties in accordance with a producer allocation formula whether or not the claimant alleged exposure to the party's asbestos products. Thus, the Wellington Agreement avoided the need to assert cross-claims against asbestos producers in the underlying asbestos lawsuits and drove down associated defense costs.

On October 6, 1988, the Center for Claims Resolution, Inc. (CCR), was organized to replace ACF, which was officially dissolved on October 3, 1988. The CCR subsequently disbanded in early 2001. Since February 1, 2001, NSI-DE directly retained attorneys to defend itself from asbestos claims, engaging a law firm to serve as national counsel to coordinate local attorneys to defend NSI from asbestos claims in the jurisdictions where they arose. NSI-DE also engaged a claims processing and administration services.

As part of the NSI acquisition due diligence Mr. Kelly, by and through his counsel, requested a review of NSI-DE's asbestos liabilities, related insurance coverage, and other financial considerations. On March 19, 2003, Peterson Consulting issued an analysis of NSI's asbestos liabilities (Peterson Consulting report). The Peterson Consulting report estimated that NSI would pay between

**[*19]** $240 and $262 million for indemnity costs and $49 and $81 million for defense costs to resolve all pending and future asbestos claims filed through 2012. The report also concluded that all but $16 million of NSI-DE's asbestos liabilities through 2014 would be covered by solvent insurance providers. Specifically, the Peterson Consulting report concluded by stating:

> Based on our independent review of NSI's historical claims data, our evaluation of NSI's pending claims, and our estimates of NSI's future asbestos claims filings through 2012, we believe that NSI will continue to incur liability associated with asbestos bodily injury claims for the next 50 years. We estimate the range of total liability incurred by NSI for asbestos bodily injury claims from 2003 through 2014, from claims filed through 2012, to be approximately $240 million to $262 million and from $49 million to $81 million for defense payments, for a total of from $289 million to $343 million. We estimate that all but $16 million of this amount will be covered by insurance provided by insurers that are currently solvent.

As part of the NSI acquisition, Mr. Kelly obtained two appraisals of NSI-DE. On March 31, 2003, Houlihan, Lokey, Howard & Zukin, Inc., prepared an analysis of NSI-DE's value which determined that as of the date of the report NSI-DE's assets exceeded its stated and contingent liabilities and concluded NSI-DE "should be able to pay its debts as they become absolute and mature." On June 12, 2003, Jefferies & Co., Inc., issued an analysis of NSI-DE's solvency and likewise concluded that NSI-DE's assets exceeded its stated and identifiable contingent

[*20] liabilities (which included the asbestos claims) and it "should be able to pay its debts as they mature."

When the NSI acquisition was completed, NSI-DE had over $1 billion in insurance coverage and equity in its assets, which would have been sufficient to pay its asbestos liabilities in full. It had virtually no debt besides the accrued asbestos liabilities. It owned numerous plants and equipment, free and clear, valued at roughly $150 million. After the NSI acquisition, Mr. Kelly continued to operate National Linen and Atlantic Envelope. However, in 2005 he began to sell off divisions of National Linen and completed the sale of National Linen in 2006 for a total of roughly $205 million. Also in 2006, NSI sold Atlantic Envelope for approximately $70 million. Mr. Kelly used the sale proceeds, along with interim operating income and cashflow, to fully repay the loans that he had obtained to finance the NSI acquisition. After repayment of the loans, NSI-DE had cash on hand. Although it continued to have asbestos liabilities, Mr. Kelly expected them to be fully covered with existing insurance. Accordingly, Mr. Kelly made a decision to use NSI-DE as his quasi-bank to finance his other business ventures. He had approached the NSI acquisition with the same basic plan as his prior investments, to strip cash from NSI-DE primarily through loans to his other business ventures set up as separate companies. He believed the cash available in

[*21] NSI-DE was basically his money that could be lent to his affiliated companies. He used both NSI-DE and NSI-CA to transfer funds to his affiliated companies.

NSI-DE had uninsured asbestos liabilities and the need to retain cash reserves on its balance sheets as a source to fund payment of asbestos claims. Accordingly, Mr. Kelly recorded the transfers from NSI to his affiliated companies as loans as a tool to keep NSI-DE's balance sheet static, thereby pacifying asbestos plaintiff lawyers, while putting the cash to work and earning returns from investing in other deals.

III.    Intercompany Transfers

It was after completing the NSI acquisition that Mr. Kelly decided to organize Kelly Capital to engage in investment activities without his brother and began to conduct most of his business ventures through Kelly Capital. Mr. Spriggs served as executive vice president and later as president. At the time of the NSI acquisition, NSI-DE had its own accounting department, and its accounting records initially continued to be controlled by its own accounting staff and CFO. At some point, the accounting records and responsibilities were transferred to Kelly Capital.

[*22] During 2004 though 2007 Mr. Kelly organized three more entities as part of his business investment activities. In July 2004 he organized FSIF with Mr. Spriggs. Kelly Capital initially owned 95% of FSIF, and Mr. Spriggs owned 5%. FSIF was organized after questions were raised about a $23.8 million transfer from NSI-DE to FCC. As a result of these questions the transfer was recorded as a transfer from NSI-DE to FSIF and then from FSIF to FCC. NSI-DE transferred additional amounts to FSIF during 2005 and FSIF repaid approximately $6.2 million during 2006. As of the end of 2006 there was an outstanding balance in NSI-DE's books and records of at least $33.7 million due from FSIF. On June 25, 2007 Mr. Spriggs sold his 5% interest in FSIF to Kelly Capital and Kelly Capital became FSIF's sole member.

On August 28, 2005, Mr. Kelly organized Kelly Capital Investments, LLC (Kelly Investments), with Kelly Capital as its sole member. Around that time Mr. Kelly began to transfer funds from NSI-DE and NSI-CA to Kelly Capital and Kelly Investments instead of FCC. On May 30, 2006, Mr. Kelly organized Kelly Finance, LLC (Kelly Finance), with Kelly Capital as its sole member. Kelly Finance's business activity was minimal, and its existence terminated in July 2009.

Between 2004 and March 2011 NSI transferred approximately $175 million to Mr. Kelly and his affiliated companies that NSI characterized as loans in its

[*23] books and records. During 2004 through 2006 NSI transferred approximately $57.2 million to Mr. Kelly and his affiliated companies including the $33.7 million that was recorded as loans to FSIF as of the end of 2006. From 2007 to 2010 NSI transferred approximately $100 million to Kelly Capital and Kelly Investments which NSI characterized as loans as follows:[4]

| Year | Borrower | Amount |
|------|----------|--------|
| 2007 | Kelly Capital | $41,230,000 |
| 2008 | Kelly Capital | 21,537,259 |
|      | Kelly Investments | 17,536,486 |
| 2009 | Kelly Capital | 17,089,996 |
| 2010 | Kelly Capital | 3,451,696 |

Kelly Capital and Kelly Investments executed promissory notes for the transfers from NSI that provided for interest at the short-term Federal rate of interest. The accrued interest was tracked in NSI's records. Mr. Kelly did not have interest charged or accrued on loans between his single-member LLCs. During 2007 Kelly Capital repaid approximately $6.2 million of the transfers.

----

[4]We base our findings on a table attached to respondent's brief as Mr. Kelly has conceded on brief that the amounts of the transfers set forth in the table are correct.

[*24] During 2007 through 2010 NSI also transferred approximately $16.7 million directly to Mr. Kelly, which NSI recorded as loans.

IV.    Business Ventures After NSI Acquisition

       A.    Ivy Hotel

In May 2002 Mr. Kelly purchased a hotel adjacent to TBE's bar with the proceeds from the sale of JCE's real estate for $7.8 million with the idea of renovating it into a boutique hotel known as the Ivy Hotel.  Ivy Hotel, LLC, initially known as 630 F Street, LLC (IHSD), was organized to own the hotel. IHSD was wholly owned by JCE.  Mr. Kelly also acquired an apartment building with retail shops on the first floor that was adjacent to TBE's bar and abutted the hotel.  Mr. Kelly organized Gaslamp Partners as a special purpose entity to own the apartment building.  Mr. Kelly tore down the building to use the land as a parking lot for the hotel.

In March and May 2003 IHSD received offers to buy the hotel for $13.75 million, which would have resulted in an approximately $5.6 million profit.  Mr. Kelly declined these offers because he believed that he could renovate the hotel and sell it for a greater profit.  To finance the renovations, Mr. Kelly obtained a $48.5 million construction loan from Fortress.  On December 9, 2005, IHSD (together with other entities that Mr. Kelly controlled including Kelly Hospitality)

[*25] entered into a loan and security agreement with Fortress (IHSD construction loan). Mr. Kelly and Richard personally guaranteed the loan. The loan was secured by the hotel itself and JCE, as well as other properties owned by Mr. Kelly and FCC. Mr. Kelly embarked on the considerable project of completely gutting and renovating the 20,000-square-foot building. On June 6, 2007, IHSD together with the other obligors of the IHSD construction loan entered into an amendment of the loan and security agreement that increased the maximum loan amount to $65 million. Mr. Kelly also used approximately $44 million from Kelly Capital for construction costs.

When construction on the hotel finished in mid-2008, the new Ivy Hotel was a four-story hotel with a basement banquet facility, meeting rooms, and a rooftop pool and bar. After completion Mr. Kelly and his entities ran the food and beverage services at the Ivy Hotel and an outside management company ran the hotel operations. Unfortunately, the Ivy Hotel suffered with financial difficulties quickly after construction was completed. In late 2008 Mr. Kelly attempted to sell the newly finished hotel. He initially expected to sell it for $120 to $130 million, but offers soon dropped to $80 to $90 million. In 2008 the hotel was appraised at approximately $87 million.

[*26] Facing financial distress with continued ownership of the Ivy Hotel, Mr. Kelly approached Fortress to address the crushing debt. In November 2008 Mr. Kelly wrote to Fortress with an update of the Ivy Hotel's financial status and his inability to sell the hotel. Fortress put Mr. Kelly in contact with other boutique hotel owners and operators. These contacts eventually culminated in a partnership with Hyatt Hotels. As a result, the Ivy Hotel's name was changed to the Andaz Hotel. Andaz Hotel guaranteed IHSD's payment obligations on the construction loan for a period and made payments during the years at issue.

In February 2010 IHSD and Kelly Hospitality, which was one of the original obligors on the IHSD construction loan, entered into a second amendment of the IHSD construction loan with Fortress. As a condition precedent to the second amendment, Fortress required that IHSD provide additional collateral. Mr. Kelly used various properties owned by his affiliated companies and his personal residence as collateral. Among other things, the second amendment split the existing $62 million into two loans of $50 million and $12 million. Mr. Kelly and Richard personally guaranteed the two loans. The construction loan was subsequently amended five more times, but at some point Fortress was no longer willing to amend or to lend to Mr. Kelly and demanded he sell the hotel. On March 4, 2013, the hotel was sold for $53 million, which was insufficient to fully

[*27] repay Fortress. When the hotel was sold, IHSD, Kelly Hospitality, and Fortress amended the terms of the construction loan to provide for the repayment of the remaining loan balance and the release of certain collateral. Mr. Kelly was required to sign a deficiency note of $6 to $8 million, making him personally liable for this amount.

In February 2009 Mr. Kelly converted the $44 million debt due from IHSD to Kelly Capital into an equity interest in IHSD, and IHSD was released from liability on the debt. Before that time Kelly Capital had no ownership interest in IHSD. After February 2009 Kelly Capital owned 81.6% of IHSD and JCE owned 18.4%. Around that time Richard agreed to reduce his ownership interest in JCE in exchange for the cancellation of debt recorded as due to Kelly Capital. During 2009 through 2011 Mr. Kelly owned 75% of JCE and Richard owned 25%.

B.    LBHorizons

On January 20, 2005, FSIF acquired LBHorizons for $4.5 million and the assumption of LBHorizons' $2.4 million bank loan. Mr. Kelly personally guaranteed the loan. LBHorizons owned three real estate lots in Charlotte County, Florida, that it planned to develop into 15 condominium units (condos). LBHorizons engaged a general contractor to finish the condo project and obtained a $14.4 million construction loan that Mr. Kelly personally guaranteed. Mr. Kelly

[*28] also transferred funds to LBHorizons from his affiliated companies, and as of December 31, 2010, LBHorizons had a balance of $6,418,852 due to Mr. Kelly's affiliated companies and $25,000 due to FCC. Mr. Kelly reported these debts as discharged in 2010.

In 2008, 2009, and 2010 LBHorizons sold three, five, and seven condos, respectively. For 2010 Mr. Kelly reported cost of goods sold by LBHorizons relating to construction costs for the condos of $5,004,200, which respondent has conceded is allowable. He also deducted an interest expense of $156,405, which respondent disallowed in its entirety, and licenses and taxes of $11,386 and other expenses of $33,577, of which respondent disallowed $53,314 and $19,943, respectively.

C.   Virtucon

On or around April 19, 2004, Virtucon was organized as a single-member LLC to acquire an airplane. Mr. Kelly was the sole member of Virtucon during the years at issue. On May 6, 2004, Virtucon purchased a 1988 Gulfstream Aerospace GIV airplane and made improvements for a total cost of approximately $12.3 million, financing the purchase with a bank loan. NSI-DE and Mr. Kelly guaranteed the loan. Virtucon also paid $125,000 in broker's fees and $16,225 in title insurance as part of the purchase. Mr. Kelly purchased the airplane to allow

[*29] him and others to more efficiently visit Atlantic Envelope's and National Linen's manufacturing plants. Mr. Kelly also used the airplane for personal purposes, and he was not charged for his personal use, on the basis of a decision by his accounting staff.

Sometime in 2007 Mr. Kelly decided to charter the airplane to repay the acquisition loan. Bob Freeman, Virtucon's chief pilot, worked with brokers to find potential customers. On June 23, 2008, Virtucon, Mr. Kelly, the Michael R. Kelly Trust (MRK Trust), NSI-DE, and FCC entered into a loan agreement with Bank of America to refinance the original purchase loan for $15,126,640, and Virtucon executed a promissory note (Bank of America loan). Mr. Kelly, the MRK Trust, and NSI-DE guaranteed the debt including various modifications and forbearance agreements related to the security agreement.

As of December 31, 2008 and 2009, the outstanding balance on the Bank of America loan was at least the initial principal amount, $15,126,640. In 2010 Bank of America requested that Mr. Kelly sell or surrender possession of the airplane. On or around October 1, 2010, Bank of America, Mr. Kelly, FCC, and NSI-DE entered into a loan modification agreement in which the borrowers (including Mr. Kelly) agreed that the outstanding loan was $15,825,700, which (with rounding) consisted of $14,710,329 of principal, $921,624 of accrued and unpaid interest,

[*30] and $193,746 of unpaid late charges. Mr. Kelly personally guaranteed the loan modification. Virtucon later surrendered possession of the airplane to Bank of America in partial satisfaction of the loan in the amount of $7.5 million, reducing Virtucon's indebtedness to $8.8 million. On January 9, 2012, Virtucon and Bank of America entered into a mutual release and settlement agreement. In April 2012 Virtucon's existence terminated.

On Schedule C filed for Virtucon for 2010 Mr. Kelly deducted interest expenses of $1,656,596 for amounts that were paid to Bank of America. Respondent determined that Virtucon paid $272,020 to Bank of America as interest and disallowed the remainder. During 2010 Virtucon had received transfers from Mr. Kelly's affiliated companies of approximately $2.8 million.

D. KY&C

On or around February 21, 2008, KY&C was organized as a Cayman Islands corporation to acquire a Cayman Islands-flagged yacht from a distressed seller for roughly half of its original purchase price. In March 2008 KY&C purchased the 131-foot yacht for approximately $9.4 million naming the yacht MY Brazil. To fund the purchase, KY&C obtained an $8.1 million bank loan from Wells Fargo. Mr. Kelly and Kelly Capital guaranteed the loan. Mr. Kelly paid the remainder of the purchase price. Mr. Kelly completely refitted the vessel with the

[*31] expectation of selling or chartering it. In April 2008 KY&C contracted for management services for the yacht, obtained a Federal employer identification number, and registered to transact business in California.

With no prospective buyer Mr. Kelly decided to charter MY Brazil, initially in Europe. On March 11, 2009, KY&C engaged a charter marketing service and shipped the yacht to Italy where it sat until a rogue wave smashed it into an adjacent vessel. Litigation and insurance disputes prevented MY Brazil from undocking. Unfortunately, the charter season had ended before it was allowed to undock. Mr. Kelly returned MY Brazil to Florida and attempted to work out the loan with the lender.

KY&C did not make any payments on the loan. As of September 22, 2010, the loan balance was the original principal, $8.1 million, plus interest. In May 2010 KY&C received an offer to purchase the yacht for $8 million and in early 2011 received two additional offers of $6 million and $5.3 million. Mr. Kelly declined these offers. On February 22, 2011, Wells Fargo took possession of the yacht and on November 23, 2011, sold it for $3.3 million. Around that time, KY&C, Kelly Capital, and Mr. Kelly entered into a deficiency agreement with Wells Fargo (2011 deficiency agreement), wherein the parties agreed that as of January 31, 2011, the loan balance was $8,374,475, comprising approximately

[*32] $8.1 million in outstanding principal, $272,863 in unpaid interest, and $1,612 in late charges.

Included in the 2011 deficiency agreement was an agreement that Wells Fargo could pay protective advances to maintain MY Brazil. It provided:

> Lender may pay such amounts as Lender in its sole discretion deems appropriate for the protection and maintenance of the Property including, without limitation, payment of the crew and captain employed on the Vessel, payment of vendors and suppliers, payment of maintenance and repair costs, payments of insurance premiums, utility services, taxes, duties, tariffs, and all other fees and costs and all other fees and costs the Lender deems necessary for the protection, maintenance and rightful ownership of the Property. Any amounts so paid shall be deemed "Protective Advances" and shall be secured by the Security Documents and included in the Total Amount Due as defined in Section 1 of this Agreement.

The 2011 deficiency agreement further provided that KY&C, Kelly Capital, and Mr. Kelly were obligated to "first repay (i) the Initial Protective Advances and (ii) any Current Taxes paid by the Lender, without discount and without application of any proceeds from the sale of the Property." KY&C, Kelly Capital, and Mr. Kelly did not make any payments under the 2011 deficiency agreement and on October 1, 2014, entered into an amended and restated deficiency agreement. The amounts owed under this agreement were paid in full.

Mr. Kelly's sole ownership of KY&C rendered it a controlled foreign corporation subject to the reporting requirements of section 6038. No Form 5471

[*33] was timely filed for KY&C for tax year 2008 or 2009. In October 2019 respondent informed Mr. Kelly about the missing Forms 5471, and Mr. Kelly filed the forms shortly thereafter.

On the Schedules C filed for KY&C for 2010 and 2011 Mr. Kelly deducted expenses that were paid with borrowed funds. For 2010 he deducted $782,542 in expenses, and respondent disallowed $143,746 of the deductions including $21,844 deducted for car and truck expenses. For 2011 he deducted $298,442 in expenses and $111,591 for depreciation, and respondent disallowed all but $2,054 of the expense deductions and disallowed $27,874 of the depreciation deduction.

V.     Failure of Businesses

By 2008 Mr. Kelly found it difficult to pay his creditors. He wanted to avoid bankruptcy but found it impossible to pay third-party debt including loans made by Fortress. At the end of 2007 he started to reduce debt owed between his affiliated companies by writing off debt due to FCC. He also reduced the debt due to NSI-DE by declaring dividends and distributing the debt to the shareholders. By 2008 the recapitalization of NSI was unrealistic. Mr. Alonso, Kelly Capital's general counsel, discussed filing bankruptcy with Mr. Kelly in 2008. Mr. Kelly's business ventures such as the Ivy Hotel were failing and did not provide a reasonable prospect of repaying the advances from NSI. Yet Mr. Kelly continued

[*34] to advance approximately $20 million from NSI to Kelly Capital during 2009 and 2010. The situation was made worse by a subsequent $35.7 million default judgment entered against NSI in an asbestos lawsuit in May 2011.

### A.    Writeoff of Debt to FCC

As of December 31, 2007, FCC's books reflected that there was debt due from Mr. Kelly's affiliated companies to FCC of $25,594,007. On that date FCC wrote off as bad debts amounts due from the affiliated companies as follows:

| Entity | Amount |
| --- | --- |
| Hidden Hills Holding | $3,883,567 |
| Hidden Hills Resort | 4,462,446 |
| Lucky Bastard Records | 952,393 |
| Twin Peak Plaza | 725,803 |
| Total | 10,024,210 |

### B.    NSI Dividends of Debt

In 2007 and 2008 NSI-DE declared that the shareholders would receive dividends of the purported debts due to NSI-DE from FSIF, Kelly Capital, Mr. Kelly, and Mr. Spriggs. The payment of those dividends meant that FSIF, Kelly Capital, Mr. Kelly, and Mr. Spriggs no longer owed the dividend amounts to NSI-DE and NSI-CA. Instead, the debts were due to NSI-DE's shareholders. On June 25, 2007, NSI declared a dividend of the FSIF debt of $31,131,284 (2007

[*35] dividend), which was allocated 95% to Kelly Capital ($29,574,307) and 5% to Mr. Spriggs ($1,556,564). According to the 2007 dividend in kind, FSIF no longer owed the dividend amount to NSI and instead owed it to Kelly Capital and Mr. Spriggs.

On December 31, 2008, NSI declared a dividend of $40,197,895 (2008 dividend) that was allocated 95% to Kelly Capital and 5% to Mr. Spriggs. Kelly Capital received a dividend of debt due from Mr. Kelly to NSI-DE of $24.5 million plus interest of $2,161,419 for a total of $26,661,419 and a debt due from Kelly Capital of $9,703,876 plus interest for a total of $11,459,081. Mr. Spriggs received a dividend for that amount that he had due to NSI of $1,813,747 plus interest. According to the 2008 dividend in kind, the $26,661,419 debt was due from Mr. Kelly to Kelly Capital and Kelly Capital no longer owed the $11,459,081 debt to NSI-DE. On its books and records NSI-DE treated the dividend of the $11,459,081 debt due from Kelly Capital as a shareholder distribution and reduced the amount due from Kelly Capital by $11,459,081. According to the 2008 dividend in kind, Mr. Spriggs no longer owed $1,813,747 plus interest to NSI-DE.

During 2008 NSI-CA also transferred stock in two unrelated companies, IMPAC and Freemont, to Kelly Investments. NSI-CA initially recorded the

[*36] transfer of the Freemont stock as a $1.8 million debt due from Kelly Investments but later increased the amount to $8.1 million.

### C. Separation of Brothers' Businesses

During the 2008 recession Mr. Kelly and Richard decided to separate their business affairs. Kelly Capital had transferred substantial amounts of money to Richard including approximately $3.5 million in both 2007 and 2008 and an additional $800,000 in 2009. Richard used these funds to pay personal expenses. As of May 2009 he had a balance due to Kelly Capital of $1,871,518 and TBE had a balance due of $309,529. In the process of separating Mr. Kelly and Richard's businesses, Kelly Capital agreed to cancel these debts as part of an exchange agreement dated May 11, 2009. The brothers also restructured their ownership interests in various businesses that they jointly owned including JCE, TBE, and one other entity not relevant here. They went from equal owners of JCE to Mr. Kelly's owning a 75% interest and Richard's owning 25%. For TBE, of which Mr. Kelly and Richard had owned 51% and 49%, respectively, Richard's interest increased to 77.6%, Mr. Kelly's interest decreased to 18.2%, and three other individuals received the remaining interest.

**[*37]** D.     2010 Discharge of Debt

In March 2010 Mr. Kelly disposed of his interest in Radius Mortgage. Sometime in late 2010 or early 2011 Mr. Kelly had a meeting with his legal, tax, and accounting advisers, including Mr. Thomas, Mr. Bowen, and Mr. Marks, who advised Mr. Kelly that he was insolvent.  Mr. Kelly wanted to avoid bankruptcy but found it impossible to repay third-party loans due to Fortress and Home Savings & Loan Co. (Home Savings).  On December 30, 2010, Mr. Kelly removed Mr. Spriggs from NSI-DE's board of directors and elected himself the sole director.  The next day, as the sole director of the board, Mr. Kelly decided to write off debts of $63,910,310 and $14,916,596 due from Kelly Capital and Kelly Investments, respectively.  These debts were due to both NSI-DE and NSI-CA. For the 2010 tax year Mr. Kelly wrote off debt due to and from his affiliated companies and claimed short-term capital losses for the discharged debt.

On his 2010 personal return Mr. Kelly reported bad debt writeoffs of $86,979,956 as short-term capital losses from his single-member LLCs as follows: $72,968,676 from Kelly Capital, $9,672,301 from Kelly Investments, $4,127,750 from FSIF, $24,972 from Kelly Hospitality, and $186,257 due from Virtucon.  Of the $72,968,676 written off by Kelly Capital Mr. Kelly personally owed $25.8 million and the remainder was owed by Mr. Kelly's affiliated companies:  $2

**[*38]** million due from Greenback Entertainment, $4.7 million from Greenback Holdings, $17.9 million from FCC, $1.5 million from Lemen Road Properties, LLC (Lemen Road), $7.2 million from Kelly MOB1, LLC (MOB1), $2.7 million from Virtucon, $4.3 million from KY&C, and $6.4 million from LBHorizons.

Mr. Kelly also reported $1,854,905 of short-term capital losses that had passed through from the bad debts of NSI-DE, JCE, IHSD, FCC, and Greenback Entertainment as set forth in more detail below. He calculated losses from the writeoff of the total bad debts due to these five entities of approximately $91.4 million and claimed the reduced amount as a loss deduction on the basis of loss limitations. He reduced tax attributes of these entities and carried forwarded $57,650,995 of the losses. In total, he reported net short-term capital losses of $88,834,861. He also reported net long-term capital gain of $7,554,255.

NSI wrote off debt of $63,910,310 and $14,916,596 due from Kelly Capital and Kelly Investments, respectively, and claimed a $78,826,906 short-term capital loss for "BAD DEBT WRITE OFF" on its 2010 S corporation return. As a 95% shareholder, Kelly Capital was allocated $74,885,561 of the loss deduction. NSI attached a statement to its 2010 return stating that Kelly Capital and Kelly Investments were insolvent, as follows:

**[*39]** NON-BUSINESS BAD DEBT:  IN PREVIOUS YEARS NATIONAL SERVICE INDUSTRIES, INC. * * * ADVANCED KELLY CAPITAL, LLC * * * $63,910,310 AND KELLY INVESTMENTS, LLC * * * $14,916,596 * * * FOR A TOTAL OF $78,826,906.  IT WAS DETERMINED THAT KELLY CAPITAL, LLC AND KELLY CAPITAL INVESTMENTS, LLC WERE INSOLVENT THEREFORE THIS AMOUNT WOULD NOT BE RECOVERED AND SHOULD BE WRITTEN OFF AS NON-BUSINESS BAD DEBT.

FCC and IHSD also reported short-term capital losses from the writeoff of bad debt of $5,603,393 and $12,287,799, respectively, including debt due from Kelly Capital, Kelly Investments, and JCE.  However, a substantial amount of the debt that FCC wrote off, $4.2 million, was due from Mr. Kelly personally.

On his 2010 return Mr. Kelly reported the discharge of debt due from his affiliated companies and attached Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment), reporting a discharge of indebtedness of $145,559,306 that was excluded from gross income on the basis of his insolvency calculated as follows:

| Entity | Amount |
|---|---|
| Greenback Holdings | $2,605,586 |
| JCE | 3,793,437 |
| IHSD | 7,052,215 |
| FCC | 4,200,407 |

| | |
|---|---|
| Kelly Hospitality | 3,027,829 |
| KY&C | 4,299,116 |
| LBHorizons | 6,418,852 |
| Radius Mortgage | 86,575 |
| Kelly Investments | 16,928,020 |
| Lemen Road | 1,561,373 |
| MOB1 | 7,161,363 |
| Kelly Capital | 85,743,031 |
| Virtucon | 2,659,565 |
| FSIF | 21,937 |

Included in this calculation is the debt due from Kelly Capital and Kelly Investments of approximately $63.9 million and $14.9 million, respectively, that NSI wrote off and reported on its 2010 return. Of the above calculation of COD income, only a small portion of the debt is unrelated to transfers from NSI. The following debt was not related to transfers from NSI: the entire amount owed by Kelly Hospitality and IHSD, $1,201,000 of the Lemen Road debt, and $3,793,437 of the JCE debt. Mr. Kelly also had COD income of $4,011,851 from the discharge of debt owed to third-party lender Home Savings. On December 23, 2010, Mr. Kelly and his affiliated companies entered into an omnibus forbearance agreement with Home Savings that discharged debt of $4,011,851. Accordingly,

[*41] Mr. Kelly had COD income for 2010 unrelated to transfers from NSI of at least $19,329,039.

Included in the 2010 debt writeoff was $7,161,363 due from MOB1. At the time of the writeoff MOB1 owned and leased a medical office building. The rental activity was unprofitable during 2009 and 2010. However, after the writeoff Mr. Kelly sold rights in three cell towers on the building's roof for $1 million and then sold the building in a separate transaction.

FCC and Greenback Entertainment also filed Forms 982 attached to their 2010 returns. FCC reported COD income of $21,175,933, including $17,848,030 due to Kelly Capital, $2,127,750 due to FSIF, and the remainder due to five other companies. On Form 982 FCC reported $20,992,619 of discharged of debt excluded from its gross income on the basis of its insolvency. FCC claimed a short-term capital loss deduction of $5,603,393 for the writeoff of bad debt due from Mr. Kelly and his affiliated companies including $1,356,802 due from JCE, $11,424 from Kelly Investments, $33,516 from Kelly Capital $4,200,407 from Mr. Kelly, and the remaining $1,243 from two other entities not relevant here.

On its 2010 return Greenback Entertainment reported a short-term capital loss of $563,811 from the writeoff of a bad debt from Greenback Holdings. Greenback Entertainment also filed a Form 982 attached to its 2010 return

[*42] reporting the discharge of $2,014,061 of debt due to Kelly Capital. Greenback Entertainment reported that the discharged debt was excluded from its gross income on the basis of its insolvency.

On its partnership return for 2010 IHSD reported short-term capital losses for "BAD DEBT WRITE OFF" of $12,287,799 and reported COD income of $8,640,303, which included the COD income from discharged debt owed to Fortress. The COD income was allocated $7,052,215 to Kelly Capital and $1,588,088 to JCE.

E.      NSI-DE's Bankruptcy

As of May 9, 2010, Kelly Capital's books showed a debt of $500,000 due from NSI-DE to Kelly Capital. On that date Kelly Capital purchased NSI-CA from NSI-DE in exchange for release from the $500,000 debt. In July 2012 NSI-DE filed a voluntary petition for chapter 7 bankruptcy to which NSI-DE's board of directors gave its unanimous written consent. Therein NSI-DE's board of directors stated that "it is in the best interest of the Company, its creditors, and other interested parties to file a voluntary petition for relief". In its bankruptcy petition, NSI-DE reported assets of less than $300,000 and liabilities of approximately $55 million consisting primarily of unsecured asbestos claims which included the $35.7 million default judgment.

[*43] On June 4, 2014, the bankruptcy trustee commenced an adversarial proceeding against NSI, Kelly Capital, KCI, FSIF, NSI-CA/Englewood, Mr. Kelly, and Mr. Spriggs. On November 23, 2015, Mr. Kelly and the other defendants filed an answer denying the trustee's allegations and asserting defenses. On January 16, 2017, the parties to the bankruptcy proceeding filed a motion to approve a compromise in accordance with a settlement agreement that called for a $3.5 million stipulated judgment against Mr. Kelly. The motion to approve compromise was granted on February 10, 2017.

In 2012 Mr. Kelly organized two new entities, Kelly Investment Group, LLC, and KC Advisors, LLC. He moved all of Kelly Capital's employees to these new entities. In 2013 Kelly Capital's existence terminated.

## VI. Personal Life

On April 18, 2006, Mr. Kelly moved from San Diego, California, to Miami Beach, Florida. In September 2007 he purchased the residence in Miami Beach, Florida (Miami house), for approximately $11.2 million, making a $5 million downpayment and obtaining a mortgage for the rest. He did not default on the mortgage and eventually sold the house in late 2009 for approximately $9.2 million.

[*44] Mr. Kelly married Nicole Dahm on October 4, 2008.  In August 2009 Mr. Kelly moved back to San Diego, California, initially moving back into his condo in San Diego, California (San Diego condo).  He sold the San Diego condo on November 8, 2011, for $3 million.  In late 2009 he purchased his current home in Rancho Santa Fe, California, for $8.92 million, obtaining a $5 million mortgage from Bank of America and using the proceeds of his Miami house sale to pay the remainder of the purchase price.  As of December 31, 2010, Mr. Kelly also owned a condo in Woodstock, Georgia.

VII.  Return Reporting

In 2000 Mr. Kelly retained F. Laurence Scott, Jr., of Scott & Cronin, LLP (S&C), to prepare his personal return for 1999.  Mr. Scott was Mr. Kelly's primary contact at S&C.  Mr. Scott and Jason Brustkern, also of S&C, were involved in the preparation of Mr. Kelly's 2007 through 2011 personal returns.  Both men are C.P.A.s with no history of adverse disciplinary actions or Internal Revenue Service (IRS) preparer penalties.

Mr. Kelly received and reported wages from NSI of approximately $1 million per year for 2007 and 2008.  He also reported a minimal amount of wages from FCC of less than $10,000 per year for each of the years at issue.

**[*45]** As explained above, Mr. Kelly did not cause his single-member LLCs to file entity-level returns. Instead, he reported the tax items for the LLCs on Schedules C attached to his personal returns. See sec. 301.7701-3(b), Proced. & Admin. Regs. (providing that a single-member LLC is a disregarded entity). Accordingly, Kelly Capital, Kelly Investments, Kelly Hospitality, FSIF, Virtucon, KY&C, Radius Mortgage, and LBHorizons did not file entity-level returns for the years at issue, and Kelly Finance did not file entity-level returns for 2007 through 2009, the years of its existence.

Mr. Scott prepared the Schedules C for KY&C that were attached to Mr. Kelly's 2008 and 2009 personal returns. On April 3, 2009, Mr. Thomas sent an email to Mr. Scott stating that

> [KY&C] is a Cayman Island Entity and I am not sure what taxes and returns have to be filed in the Cayman Islands. * * * I am not sure what filing requirements we have in the US since this is a Cayman Island entity and how this flows through to Michael Kelly's personal return but it will have to be dealt with when filing returns for 2008.

Despite this message, Form 5471 was not filed for KY&C for 2008. Attached to Mr. Thomas' April 3, 2009, email were several "LLC Information Sheets", one of which listed KY&C as a Cayman Islands entity owned 100% by Kelly Capital.

**[*46]** VIII.   The Audit

Mr Kelly's audit began with an examination of his 2010 personal return on or around September 17, 2012.  On October 1, 2012, 14 days after the initial contact letter, Mr. Scott and/or Mr. Brustkern contacted the revenue agent assigned to the audit.  After an exchange of voicemails to schedule a phone conference for October 12, 2012, the revenue agent missed that phone conference but on October 24, 2012,  requested a meeting with Mr. Kelly in a telephone call with Mr. Scott.  On that same day, Mr. Scott sent a letter to the revenue agent enclosing tax returns that the agent had requested.

On November 20, 2012, Mr. Kelly and his representatives met with the revenue agent at Mr. Kelly's office.  Mr. Kelly participated in the meeting and answered the questions that the revenue agent asked.  The meeting was cut short by the revenue agent, not Mr. Kelly or his representatives.  Generally, requested records were freely provided by Mr. Kelly or Mr. Scott to the IRS.  Mr. Kelly was not summoned to meet with the IRS.

There were between 15 and 20 voluntary meetings between IRS revenue agents and Mr. Kelly or his representatives during the course of the examination.  There were also at least three voluntary meetings between the IRS Office of Appeals and Mr. Kelly's representatives following the audit.  Mr. Kelly answered

**[*47]** all the IRS' questions at the subsequent meetings where he was present.  In short, he cooperated with the audit.  He agreed to extend the periods of limitations when the IRS asked him to do so.

Respondent issued two notices of deficiency to Mr. Kelly, the first on December 10, 2015, for tax years 2010 and 2011, and the second on May 19, 2016, for tax years 2007, 2008, and 2009.  The second notice of deficiency was the first formal communication to Mr. Kelly of the initial determination to assess penalties for tax years 2007, 2008, and 2009.  Respondent's initial determination of the fraud penalty under section 6663(a) for 2007, 2008, and 2009 was personally approved in writing by the immediate supervisor of the IRS employee who made the initial determination, as required by section 6751(b), on October 8, 2015, a date before the mailing of the notice of deficiency for those years.

OPINION

I.    Statute of Limitations

The period of limitations under section 6501 is in dispute for  2007, 2008, and 2009.  Respondent argues the filing of false or fraudulent returns with the intent to evade tax under section 6501(c)(1).  He argues that the periods of limitations remain open under section 6501(c)(8) for 2008 and 2009 on the basis that Mr. Kelly failed to file timely Forms 5471 to report KY&C as a controlled

[*48] foreign corporation as required by section 6038(a)(1) for these two years. Respondent also argues that the six-year rule for a substantial omission from gross income under section 6501(c)(1) and (e) provides a separate ground to assess a deficiency for 2009. We later hold that fraud is not sustained, so we must review respondent's alternative positions. Mr. Kelly acknowledges that 2009 is potentially subject to the six-year rule of section 6501(e) for a substantial omission from gross income.

Mr. Kelly filed the Forms 5471 for 2008 and 2009 in 2019. Accordingly, section 6501(c)(8) may hold open the 2008 and 2009 periods of limitations until October 23, 2022, three years from when Mr. Kelly filed the Forms 5471. However, if reasonable cause for the failure to file Forms 5471 exists, then under section 6501(c)(8)(B) only the adjustments related to KY&C would remain open under the statute of limitations. Petitioner asserts that reasonable cause exists and stems from the failure of Mr. Kelly's tax return preparer, S&C, to follow through on the information Mr. Kelly and his staff provided to it.

Section 6501(c)(8) does not define reasonable cause. Nor do the regulations thereunder. However, it is appropriate to rely on the Supreme Court's definition in United States v. Boyle, 469 U.S. 241, 246 (1985), that the taxpayer must exercise "[o]rdinary business care and prudence" (quoting section 301.6651-

[*49] 1(c)(1), Proced. & Admin. Regs.).  We have relied on this definition for the reasonable cause defense to the section 6038(b) penalty for a failure to furnish the appropriate information with a return.  See Flume v. Commissioner, T.C. Memo. 2017-21.  Taxpayers can establish reasonable cause on the basis of their reliance on the advice of a tax professional.  Id.  Such reliance requires that the taxpayer prove:  (i) the adviser was a competent professional with sufficient expertise, (ii) the taxpayer provided necessary and accurate information to the adviser, and (iii) the taxpayer relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  The taxpayer's education and business experience are relevant to determine whether he reasonably and in good faith relied on a tax professional.  Sec. 1.6664-4(b)(1), Income Tax Regs.

S&C has prepared Mr. Kelly's personal returns since 2000, including Schedules C for his affiliated companies.  S&C prepared approximately 700 tax returns per year.  Mr. Scott was the primary contact for the preparation of Mr. Kelly's returns.  Mr. Scott is a C.P.A. with no history of adverse disciplinary actions or IRS preparer penalties.  He had decades of experience with Federal tax return preparation but had no prior knowledge of Form 5471 in 2009.  It was reasonable for Mr. Kelly to rely on Mr. Scott.  S&C was adequately advised that

[*50] Mr. Kelly owned a Cayman Islands entity. Mr. Kelly's staff pointed out that there might be a different reporting. Conversely, in Flume, the taxpayer failed to provide his tax return preparer all the necessary information.

Respondent contends that it was not enough for Mr. Kelly to inform S&C that KY&C was a foreign entity, and he implies that Mr. Kelly should have advised Mr. Scott that Form 5471 was required. The failure to file the Forms 5471 does not present an obvious tax obligation which was negligently omitted from information that a taxpayer provided to the return preparer. Mr. Kelly, through his staff, provided the necessary information to S&C, identified KY&C as a foreign corporation, and stated that he was unsure of the reporting requirements. Having done this, Mr. Kelly reasonably relied on S&C to prepare his returns properly. While it could be argued that S&C should have done more to ascertain Mr. Kelly's filing obligations, it was reasonable for Mr. Kelly to rely on S&C do so. A taxpayer need not question the advice provided, obtain a second opinion, or monitor the advice received from the professional. Boyle, 469 U.S. at 251.

At trial, Mr. Scott credibly described the reasons that his firm failed to prepare Form 5471 for KY&C. No facts suggest that the failure was the result of a conflict of interest or a "too good to be true" situation for either year. Ultimately, Mr. Kelly's reliance on S&C to help meet his filing obligations was reasonable

**[\*51]** and done in good faith, and the periods of limitations for 2008 and 2009 do not remain open for adjustments unrelated to KY&C under section 6501(c)(8)(A) after the application of section 6501(c)(8)(B). In fact, respondent did not advise Mr. Scott about the nonfiling of the Forms 5471 until 2019, three years after these cases began. Mr. Scott prepared and filed the Forms 5471 quickly thereafter. We hold that Mr. Scott's lack of prior experience with Form 5471 was not fatal to a finding of Mr. Kelly's reasonable reliance on him or S&C.

## II. Fraud

Respondent determined fraud penalties under section 6663, for which respondent bears the burden of proof by clear and convincing evidence. See sec. 7454(a); Rule 142(b). Respondent's burden is to prove, for each year, by clear and convincing evidence, that (1) Mr. Kelly underpaid his tax for that year and (2) some part of that underpayment for that year was due to fraud. See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

Fraud for these purposes is defined as intentional wrongdoing with the specific purpose of avoiding a tax believed to be owed. DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). Stated differently, imposition of the civil fraud penalty is appropriate upon a showing by the Commissioner that the taxpayer intended to evade taxes believed to be owing by

[*52] conduct designed to conceal, mislead, or otherwise prevent the collection of taxes. Id.; see also Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). But fraud "does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik, 236 F.2d 844, 846 (3d Cir. 1956). Fraud "is not proven when a court is left with only a suspicion of fraud, and even a strong suspicion is not sufficient to establish a taxpayer's liability for the fraud penalty." Branson v. Commissioner, T.C. Memo. 2012-124, slip op. at 23 (citing Olinger v. Commissioner, 234 F.2d 823, 824 (5th Cir. 1956), aff'g in part, rev'g in part on another ground T.C. Memo. 1955-9, Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950), and Green v. Commissioner, 66 T.C. 538, 550 (1976)). Moreover, even when a taxpayer "engage[s] in aggressive tax planning to minimize his taxes", this Court has found that such action alone is not enough to establish the requisite fraudulent intent. Klaas v. Commissioner, T.C. Memo. 2009-90, slip op. at 33, aff'd, 624 F.3d 1271 (10th Cir. 2010).

As direct proof of a taxpayer's intent is seldom available, fraud has been established by circumstantial evidence and reasonable inferences drawn from the record. Stoltzfus v. United States, 398 F.2d 1002, 1005 (3d Cir. 1968); DiLeo v. Commissioner, 96 T.C. at 874. Courts have thus developed a list of "badges of fraud" useful in determining whether there is circumstantial evidence of fraudulent

[*53] intent.  Niedringhaus v. Commissioner, 99 T.C. 202 (1992).  Among the badges of fraud that can be gathered from the caselaw of the Court of Appeals for the Ninth Circuit, to which these cases are appealable, are the following:  (1) an understatement of income, (2) inadequate maintenance of records, (3) a failure to file tax returns or the filing of false returns, (4) offering implausible or inconsistent explanations of behavior, (5) concealment of income or assets, and (6) failure to cooperate with tax authorities.  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601.  Courts have also considered:  (7) engaging in illegal activities; (8) dealing in cash; (9) failing to make estimated payments; (10) offering false or incredible testimony; and (11) filing false documents.  Niedringhaus v. Commissioner, 99 T.C. at 211; Parks v. Commissioner, 94 T.C. at 664-665.

Additionally, the taxpayer's background, level of education, and prior history of filing proper returns are relevant.  Niedringhaus v. Commissioner, 99 T.C. at 211.  A taxpayer's education and sophistication are not themselves badges of fraud but are relevant factors in determining "whether a taxpayer could have formed the intent necessary to be found liable for the fraud penalty."  Holmes v. Commissioner, T.C. Memo. 2012-251, at *31 n.16 (quoting Wickersham v.

[*54] <u>Commissioner</u>, T.C. Memo. 1999-267, slip op. at 12), <u>aff'd</u>, 593 F. App'x 693 (9th Cir. 2015).

Respondent asserts the following badges of fraud:

(1) consistent understatements of tax for 2007, 2008, 2009, 2010, and 2011;

(2) concealment of income by Mr. Kelly telling his staff that the NSI transfers were loans even though he planned to liquidate NSI and never intended to pay back the transfers;

(3) implausible and inconsistent statements made by Mr. Kelly, such as his testimony that he wanted to use the funds from NSI to invest in other business opportunities, but had spent millions of dollars of purportedly borrowed money on personal expenses and did not give NSI any ownership interest in the business ventures in which it was supposedly investing;

(4) providing false and misleading information to S&C about the transfers from NSI including false books and records that Mr. Kelly maintained for his businesses that recorded the transfers from NSI as loans;

(5) inadequate records and false documents to reflect the terms of the purported loans from NSI and the filing of Federal tax returns for 2007 through 2009 that omitted substantial amounts of income; and

**[*55]** (6) a scheme that Mr. Kelly designed to defraud creditors including the IRS, to use NSI's assets as a piggy bank for his personal spending and to cancel the debt, and to assert the insolvency of NSI to avoid paying tax.

Respondent's list depends totally on the premise that Mr. Kelly's intercompany transfers or withdrawals recorded as loans were not properly treated as loans and were concealed with intent to defraud the United States. While we do not presume the accounting by Mr. Kelly and his companies is always accurate regarding the "loans", we do not believe the record establishes by clear and convincing evidence that the "loans" were the basis of a fraudulent tax scheme; rather they were the products of two decades of Mr. Kelly's business practices. As we discuss later herein, we agree with respondent that by 2008 there was no reasonable expectation the "loans" would be repaid when incurred, and they should be treated as distributions. This conclusion does not in itself lead to a finding of fraud.

Respondent alleges but fails to prove an intent to defraud creditors, concealment of income or assets, fraudulent failure to file returns, and false statements. Rather, Mr. Kelly's companies' accounting records revealed that the transfers were recorded as loans as an established practice of his businesses. Mr. Kelly had a history of juggling all the sources of cash in his various enterprises to

[*56] leverage opportunities. He treated the cash as available to him and before the years at issue he used this strategy to build the portfolio of assets he controlled. He did not hide these transactions, and the transactions were tracked in the records of his companies.

Mr. Kelly respected his accounting staff. He respected the separate corporate entities and their accounting records, which recorded the transfers of funds generally as loans. Respondent alleges that these loans were fraudulent and that Mr. Kelly has committed tax fraud on the basis of the transfers' characterizations as loans. Respondent's position is in effect that Mr. Kelly had been engaged in tax fraud since the 1990s with his practice of using intercompany loans or that Mr. Kelly's practice became fraudulent with the NSI acquisition. We find that respondent has failed to establish fraudulent intent by clear and convincing evidence on the basis of either premise. Regardless of whether the loans were properly characterized as such for tax accounting purposes, the evidence does not prove that the loan characterizations were made with fraudulent intent.

III.  Intercompany Transfers

A key issue, if not the key issue in these cases, is whether a series of transfers from NSI to Mr. Kelly and his entities were bona fide loans or should be reclassified as taxable distributions. Mr. Kelly has consistently maintained that

[*57] they were loans, but respondent disagrees. As respondent correctly begins, an intent to establish a debtor-creditor relationship exists if, when the transfers were made, the debtor intended to repay the funds and the creditor intended to enforce repayment. See, e.g., Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970). This is also a question of fact to be determined upon a consideration of all pertinent facts. Haber v. Commissioner, 52 T.C. 255, 266 (1969), aff'd, 422 F.2d 198 (5th Cir. 1970).

> A bona fide debt is a debt that arises from a debtor-creditor relationship on the basis of a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * Whether an advance gives rise to a bona fide debt for Federal tax purposes is determined from all the facts and circumstances. * * * To constitute a bona fide debt, at the time of the transfer there must be a real expectation of repayment and an intent on the part of the purported creditor to secure repayment. * * *

2590 Assocs., LLC v. Commissioner, T.C. Memo. 2019-3, at *21.

Caselaw has established objective factors to consider when answering the question of whether a bona fide debtor-creditor relationship exists. Those factors include: (1) whether the promise to repay is evidenced by a note or other instrument that evidences indebtedness, (2) whether interest was charged or paid, (3) whether a fixed schedule for repayment and a fixed maturity date were established, (4) whether collateral was given to secure payment, (5) whether

[*58] repayments were made, (6) what the source of any payments was, (7) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan, and (8) whether the parties conducted themselves as if the transaction was a loan. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476 (1980); see also Welch v. Commissioner, 204 F.3d 1228, 1230 (9th Cir. 2000), aff'g T.C. Memo. 1998-121; Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972); Commissioner v. Valley Morris Plan, 305 F.2d 610, 618 (9th Cir. 1962) (defining a loan for Federal tax purposes as "an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree" (quoting Nat'l Bank of Paulding v. Fid. & Cas. Co., 131 F. Supp. 121, 123 (S.D. Ohio 1954))), rev'g in part 33 T.C. 572 (1959); Knutsen-Rowell, Inc. v. Commissioner, T.C. Memo. 2011-65.

Critical to our analysis, as is often the case, is factor (7). By 2008 Mr. Kelly no longer had a reasonable prospect of repaying the "loans". Mr. Kelly argues other factors support characterization as loans. He argues that the loans were supported by the accrual of interest and in most cases his companies followed formalities of documenting the transfers as loans. He also maintains that the

[*59] repayment was derailed only by the downturn in the economy that adversely affected his real estate holdings and the profit potential of his numerous transactions. We find this argument reasonable through 2007, but it loses credibility after 2007 when Mr. Kelly was well aware the economy was turning negative to his businesses but continued to have funds transferred from NSI with less and less expectation of repayment.

The respect for loan formalities also wanes as the economy made repayment all but impossible beginning in 2008. Mr. Kelly's companies followed a practice of careful accounting of loans with some repayments through 2007, but respect for the loan characterization and repayments gradually disappear after 2007. Accordingly, we hold that all NSI transfers and other intercompany transfers are not properly characterized as loans beginning on January 1, 2008. This holding affects respondent's position on whether transfers are capital distributions or dividends and, alternatively, whether Mr. Kelly has COD income for 2010. We hold that the transfers beginning on January 1, 2008, were shareholder distributions under sections 301 and 1368. This holding will require recomputations under Rule 155.

**[\*60]** IV.　　COD Income and Bad Debt Deduction for 2010

On his 2010 personal return Mr. Kelly reported $145 million of COD income that he excluded from his gross income on the basis of his alleged insolvency and claimed a short-term capital loss deduction for bad debt of $86,979,956 under section 166(a)(1), which provides for a deduction of any bona fide debt which becomes worthless within a taxable year.  Mr. Kelly made numerous transfers between his closely held companies, and on some occasions recorded loans were forgiven as shareholder distributions.

The COD income was based largely on intercompany loans and was not calculated with precision to eliminate intercompany debt or to ensure that only his personal debt was actually forgiven.  Likewise, the capital loss deduction for the bad debt was calculated using the total of the recorded intercompany debts.  Petitioner's brief discusses the issues as follows:

> In essence, because the debt was cancelled, which was picked up and reported by Mr. Kelly as cancellation of debt income, the other side of the same coin was a bad debt deduction.  As Mr. Brustkern testified, it was a "zero sum":  without one you cannot have the other.  For example, when [Kelly Capital] was not able to collect the debts owed to it from various entities, the amount was cancelled, creating Mr. Kelly's Schedule D bad debt deduction.  Concurrently, when the debt owed to [Kelly Capital] was cancelled, Mr. Kelly picked up the amount as cancellation of debt income.  The zero sum nature of this reporting is also evidenced by the fact Mr. Kelly's bad debt deduction was eliminated through the reduction of tax attributes and his

[*61] insolvency calculation. * * * In fact, S&C considered reporting neither the bad debt deduction nor cancellation of debt income, because the two essentially offset each other on Mr. Kelly's 2010 return. However, as Mr. Brustkern testified * * *: "When we were preparing the return, we wanted to make sure all -- first of all, we were just trying to make sure we reconciled all our numbers. But we wanted to make sure that all of those numbers made it on the return somewhere. And so we made a decision as we were preparing the return to show everything as far as the income and the expense, whether it was a wash or not. So that's why the 982 has the 145 and then the Schedule D has the other amount that you referred to." Ultimately Mr. Kelly is entitled to the offsetting bad debt deduction as discussed herein and presented at trial.

We are unconvinced by this logic. The bad debt deduction is not a function of the alleged COD income; rather it is debt owed to Mr. Kelly, not by him. The "zero sum" argument ignores the need to eliminate debts between his affiliated companies. Mr. Kelly's companies regularly passed funds between them. He has not proven that the COD income on the business bad debts was properly calculated and that the debts were actually owed to him or by him. Finally, our prior holding transforms much of the debt into distributions in earlier years which must be eliminated.

Mr. Kelly cannot create a deduction by recording intercompany debt and then canceling it. There must be a debt owed to Mr. Kelly that is uncollectible to create a business bad debt. Mr. Kelly has not established such debt exists or was worthless in 2010. The parties shall calculate the amount of COD income as part

**[\*62]** of the Rule 155 computations and determine the portion that is not attributable to NSI and intercompany transfers in accordance with our holdings herein. As explained above, at least $19.3 million of the reported COD income was unrelated to the intercompany transfers. Mr. Kelly has not established that the debt owed by MOB1 became worthless in the amount claimed during 2010 as MOB1 retained ownership of the office building and cell tower rights, which it later sold. Mr. Kelly valued the building at $2.9 million in his insolvency calculation.

V.    Tax Value of the $43,344,123 Debt Distribution

Mr. Kelly argues that the distribution of the shareholder debt and other distributions caused by the forgiveness of shareholder debt in 2010 should be valued at the fair market value of the debt rather than the face value. This argument turns on characterization of the debt as property and not as a cash equivalent. This argument has no support in the caselaw of this Court, which has not accepted the position. In Combrink v. Commissioner, 117 T.C. 82, 94 (2001), we stated that cancellation of shareholder debt "is considered the equivalent of a distribution of money in the face amount of the obligation." In an analogous situation, the assumption of shareholder debt under section 1001(b) is deemed money received in the face amount of the debt. Maher v. Commissioner, 55 T.C.

**[\*63]** 441, 456 (1970), <u>aff'd in relevant part and remanded in part</u>, 469 F.2d 225 (8th Cir. 1972).

The logical result of Mr. Kelly's argument would be to superimpose a test of the shareholder's solvency upon the application of section 1.301-1(m), Income Tax Regs., and the statutory treatment of such a distribution. We find no such hurdle in the statute or the regulations. Accordingly, we hold that the distributions caused by cancellation of shareholder debt are properly set at the face amounts of the debts canceled.

VI.    <u>Claimed Insolvency</u>

Mr. Kelly asserts that he was insolvent in 2010 and his liabilities exceeded his assets by over $154 million. Accordingly, he asserts relief from inclusion of COD income reflected on his 2010 personal return under section 108(a)(1)(B). This is a question of fact which is contested in these cases. The reported COD income is overstated and should be recalculated on the basis of this opinion as part of the Rule 155 computations. His proposed calculation of his liabilities for purposes of the insolvency calculation includes some liabilities of his affiliated companies which should be eliminated and some alleged debt which will be treated as distributions on the basis of our prior holding. Debts due from Kelly Capital and Kelly Investments are not properly included in the insolvency

[*64] calculation. Mr. Kelly inappropriately included $36,888,254 in secondary intercompany loans.

Respondent's insolvency calculation reflects liabilities of $88,460,849, which removed the NSI and intercompany debt. We find this calculation conforms more closely to the record. It should be used as the starting point for the computations under Rule 155 of Mr. Kelly's insolvency in 2010. Net of any debt treated as distributions on the basis of our holding herein, we adopt this figure for the necessary Rule 155 computations to determine whether there is any COD income excluded from gross income for 2010.

Respondent also argues that third-party debt owed by KY&C and personally guaranteed by Mr. Kelly should be removed from his liabilities. Such debt is appropriate to consider as liability of Mr. Kelly where it is "more probable than not that he will be called upon to pay that obligation in the amount claimed". Merkel v. Commissioner, 109 T.C. 463, 484 (1997) (establishing a liability on the basis of a personal guaranty), aff'd, 192 F.3d 844 (9th Cir. 1999). Mr. Kelly personally entered into the loan agreements for the third-party debt together with his two wholly owned LLCs, Kelly Capital and KY&C. The debt was eventually paid in full. We find that Mr. Kelly has established that as of 2010 he would be required to pay the liability. Likewise, he remained liable for the remaining $8.8

**[*65]** million loan balance on the basis of his personal guaranty after Virtucon surrendered the airplane in partial satisfaction of the bank debt and satisfied the <u>Merkel</u> standard for this liability.

Mr. Kelly has also established his liability for IHSD's $62 million construction loan. Respondent suggests on brief that the debt should not be treated as a liability of Mr. Kelly because of the Andaz Hotel's agreement to make payments on the debt for a limited time. However, respondent's insolvency calculation on brief includes $50 million of the construction loan as a liability of Mr. Kelly, which we treat as a concession by respondent. Furthermore, we find that the debt is a liability of Mr. Kelly under the <u>Merkel</u> standard. We dismiss respondent's objections to other liabilities listed in Mr. Kelly's insolvency calculation including his credit card debt.

Respondent also challenges Mr. Kelly's calculation of his assets, approximately $70 million. Respondent challenges the value that he assigned to his cars, his personal residences, Gaslamp Partners, his ownership interest in IHSD, and KY&C's yacht. We find that Mr. Kelly has established the values placed on these assets except for the yacht. Respondent placed a value of $5 million on the yacht, which we find better reflects its fair market value in the light

[*66] of the purchase offers that KY&C received for the yacht in late 2010 and early 2011 of $5.3 million to $8 million.

Respondent alleges that Mr. Kelly omitted his ownership of Virtucon's airplane, a $680,537 tax refund, and his ownership interests in 14 affiliated companies including one purportedly holding tobacco escrows. We find that the tax refund is properly included as an asset for purposes of the insolvency calculation. Virtucon surrendered the airplane during 2010. Accordingly, it is not an asset for purposes of the insolvency calculation. The record establishes that Mr. Kelly properly identified the affiliated companies that continued to have any value as of December 31, 2010, for purposes of his insolvency calculation and did not omit any entities as alleged by respondent. Those entities had no, or minimal, gross receipts or business activity. The record establishes that any omitted entities had no value. Further, the record supports the values for the following assets as set forth in Mr. Kelly's original or revised insolvency calculations: $41,697,709 for his IHSD investment, $2,025,000 for Gaslamp Partners, $950,000 for Kelly Fernley, LLC, and $2,880,000 for MOB1.

Respondent asserts that the value of Mr. Kelly's personal assets of approximately $2.6 million listed in his insolvency calculation should be doubled to include Mrs. Kelly's share of the assets on the basis of community property law.

**[\*67]** Mr. Kelly objects to this adjustment on the basis of his prenuptial agreement.  He argues that there is no community property.  Respondent's argument is premised on an allegation that Mr. Kelly did not list all of his personal property in his statement of assets.  Mr. Kelly failed to provide an itemized list of his personal property and thus cannot support the value that he assigned to his assets irrespective of community property laws.  See Bressi v. Commissioner, T.C. Memo. 1991-651, aff'd, 989 F.2d 486 (3d Cir. 1993).  Accordingly, we accept the value asserted by respondent of approximately $5.2 million.

Respondent also argues that Mr. Kelly has not established that FCC and Greenback Entertainment were insolvent as of December 31, 2010.  Mr. Kelly did not address either company's insolvency on brief and has failed to establish that they were insolvent.  FCC and Greenback Entertainment reported COD income from the discharge of intercompany debt.  The reported amount of each entity's COD income must be calculated in the Rule 155 computations on the basis of our holdings herein.  Any amount of COD income so determined does not qualify for exclusion from gross income under section 108(a).

VII.  Bad Debt Due From Richard

In 2009 Mr. Kelly and his brother Richard separated their business operations.  To accomplish the separation, Mr. Kelly transferred a portion of

[*68] ownership interest in TBE to Richard, and Kelly Capital released Richard from liability for a loan of $1,871,518 that Richard owed to Kelly Capital. Kelly Capital's books reflected $309,529 due from TBE. As part of the 2009 exchange Kelly Capital claimed a bad debt deduction of $2,667,153, which Mr. Kelly asserts includes the $1,871,518 debt due from Richard and the $309,529 debt due from TBE which flowed through to Mr. Kelly's personal return for 2009 as a bad debt deduction. Mr. Kelly has conceded $721,668 of the deduction.

The factual issues associated with the deduction are whether the original debt was worthless, whether there was consideration provided by Richard for the debt forgiveness, and whether it was a gift from Mr. Kelly together with the TBE stock. Mr. Kelly has not proven that the answers to these questions support the deduction, and we do not sustain the claimed bad debt deduction.

VIII. Virtucon Interest Deduction for 2010

For 2010 Virtucon deducted an interest expense of $1,656,597 associated with the surrender of possession of an airplane to Bank of America. Upon surrender, the aircraft was valued at $7.5 million for purposes of settling Virtucon's debt to Bank of America. Mr. Kelly contends that some portion of this amount went to pay interest by reference to a provision in the Bank of America loan documents that required payments to be applied to interest and late fees

[*69] before principal. Mr. Kelly has not established that the airplane's surrender would qualify as a loan payment or that he made any payment of interest. Accordingly, this deduction is disallowed.

## IX. Yacht Expenses

KY&C owned a yacht which was the subject of debt to Wells Fargo and a protective agreement under which Wells Fargo incurred $299,388 in expenses in 2011. Mr. Kelly reimbursed Wells Fargo for this expense, and the deduction of this expense is sustained. Various other expenses are in dispute, and on the basis of the trial record we sustain the expenses deducted with the exception of $21,844 of car and truck expenses for 2010 and $27,874 of depreciation for 2011.

## X. LBHorizons Expenses

For 2010 respondent disallowed cost of goods sold of $5,004,200 and other expenses related to LBHorizons' condo project. He concedes that Mr. Kelly is entitled to the $5,004,200 adjustment for the cost of goods sold. On the basis of the record, we find that Mr. Kelly has proven that the other expense deductions at issue were properly reflected on his 2010 personal return.

## XI. Passive Activity Loss

Mr. Kelly deducted cumulative passive losses related to FSIF and Radius Mortgage for 2010. He asserts that FSIF was abandoned in 2010. We find that

**[*70]** Mr. Kelly has established the amount of the loss claimed attributable to FCC and is entitled to deduct the loss. However, the record supports a finding that FCC had activity into 2011, and we allow the loss for that year. Respondent argues that Mr. Kelly has not established his basis in Radius Mortgage or the amount at risk therein or that the loss was incurred in the normal course of business. On the basis of the record Mr. Kelly has established that he is entitled to the carryover loss, and the deduction is sustained to the extent allowable in the Rule 155 computations.

## XII. Bank Deposit Analyses

For 2010 and 2011 respondent performed analyses of bank deposits into Kelly Capital's accounts and determined that Kelly Capital had unreported gross receipts for both years. We agree with Mr. Kelly that these unreported income adjustments duplicate respondent's basic position that loans that flowed from Kelly Capital to Mr. Kelly were distributions. We have sustained respondent on the distribution adjustments for 2010 and 2011 and find that respondent has failed to establish, to the extent he has not otherwise conceded, that the bank deposit analyses do not duplicate the distribution adjustments.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

**[*71]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.